UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| In the Matter of the Extradition of | ) | Misc. No. 23-mj-30301 |
|  | ) |  |
| Malique Idel Bent Calloo | ) |  |
| _____ | ) |  |

**MEMORANDUM OF EXTRADITION LAW AND REQUEST
FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations to Canada,[1] respectfully

requests that the fugitive in this case, Malique Idel Bent Calloo ("Calloo" or "the

fugitive"), be held without bond pending the hearing on the certification of his

extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum

summarizes the framework of extradition law in the United States and sets forth

the reasons why Calloo should be detained. In short, Calloo should be detained

because he cannot overcome the strong presumption against bail in international

extradition cases. Specifically, he cannot meet his burden of showing that he is not

---

[1] Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, *as amended by* Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. Treaty Doc. No. 101-17 (1990); and Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. Treaty Doc. No. 107-11 (2002).

a flight risk, that he is not a danger to the community, and that special

circumstances exist warranting his release.

## BACKGROUND

Canada seeks the provisional arrest, with a view towards extradition, of

Calloo so that he may be prosecuted for first degree murder in violation of Section

235(1) of the Criminal Code of Canada.[2] Justice of the Peace Elizabeth Neilson of

the Ontario Court of Justice, Windsor, Ontario, Canada, issued a warrant for

Calloo's arrest on November 30, 2022. According to information provided by

Canada, Canada sought Calloo's provisional arrest based on the following facts:

On November 28, 2022, at approximately 4:27 p.m., Windsor Police Service

received a total of five 911 calls, reporting that a man had been shot on the street

outside 888 Hanna Street East, Windsor, Ontario. One of the 911 callers, Jamar

Jones ("Jones"), identified the victim as his friend, Daniel Squalls ("Squalls").

Police arrived at the scene at approximately 4:31 p.m., where they observed

Squalls lying in the street in front of a matte red Dodge Charger. Squalls was

bleeding from his head, and there was what appeared to be brain matter splattered

---

[2] The United States obtained a warrant for Calloo's provisional arrest based only
on the charge of murder. As referenced in the complaint, Canada requested
Calloo's provisional arrest on additional charges, and the United States' decision to
proceed in urgent circumstances on the single murder charge is without prejudice
to proceeding on additional charges when Canada's formal request for extradition
has been reviewed by the Department of State and is submitted to the Court.

on the road. Paramedics arrived at the scene and removed the man's shirt, which showed that the victim had been shot an additional nine times in his chest, stomach, arms, and hands. Forensic identification officers later recovered a total of fifteen handgun shell casings from the scene. The doctor who conducted the autopsy of Squalls's body determined Squalls's cause of death to be multiple gunshot wounds.

Based on statements of multiple witnesses and video surveillance footage from the scene, police identified Calloo as the shooter and established the following motive and timeline.

Squalls and Calloo knew each other personally and have a history of animosity towards one another. At the time of his death, Squalls was in a relationship with Calloo's former girlfriend, Dashau Handsor-Dupuis ("Handsor-Dupuis"), with whom he shares a six-year-old daughter. Hansor-Dupuis told Canadian authorities that in the days prior to the shooting, Calloo had been angry because she and Squalls planned to move to the United States with Calloo's daughter.

At 12:30 p.m. on the day of the shooting, Calloo sent a Facebook audio message to Handsor-Dupuis, in which he stated "Yo, it's Malique. If I was you, I would never ever ever take that tone addressing my mother again. If you really

really do love your kids, love your life, and love your family, if I was you, I would never ever ever in your life, do that again."

At approximately 3:00 p.m., Calloo drove to Squalls's apartment building in his brown Honda car.[3] Calloo knocked on the front door of one of Squalls's neighbors[4] and asked about the whereabouts of Squalls and Handsor-Dupuis. The neighbor informed Calloo that they were not home. During this encounter, Calloo was also speaking on the telephone with an unknown person, and the neighbor heard Calloo express his frustration with his inability to see his daughter. After speaking to Calloo, the neighbor messaged Handsor-Dupuis to inform her that Calloo had come to her residence looking for her and Squalls.

According to Jones, who witnessed the murder, Calloo returned to Squalls's apartment building and encountered Squalls on the road outside the apartment building at approximately 4:18 p.m. Jones recognized Calloo as the father of Handsor-Dupius' daughter. Calloo and Squalls then engaged in an eight-minute argument before Calloo walked away from Squalls and approached the rear passenger door of the car he had driven to the scene. Calloo then returned to where he had been arguing with Squalls and brandished a handgun. In response, Squalls

[3] The neighbor told police that later that afternoon, she observed Calloo's vehicle driving away from the scene shortly after she heard multiple gunshots.

[4] In addition to being Squalls's neighbor, this witness also described herself as one of Calloo's childhood friends.

stated, "You're not going to shoot me right here in front of all the cameras." After which, Calloo appeared to pause as he waited for a van to drive past. Calloo then opened fire at Squalls, shooting directly at him 14-15 times at close range.

Calloo immediately fled the scene in the brown Honda.[5] At approximately 7:00 a.m. the following morning, on November 29, 2022, police responded to a call reporting a car on fire. Police determined that the vehicle was the same car Calloo used to flee the scene of the shooting the previous day. Records checks determined that the vehicle was registered to Calloo's mother.

In response to a request from Canada, the United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181, *et seq.*, filed a complaint in this District seeking a warrant for Calloo's provisional arrest with a view towards extradition. This Court issued an arrest warrant, and Calloo was arrested on July 23, 2023. Calloo is currently in the custody of the U.S. Marshals Service.

---

[5] Multiple witnesses consistently described Calloo's car as a dark grey or brown Honda with black tinted windows. Video surveillance footage confirmed that Calloo fled the scene in a brown Honda Civic bearing the Ontario license plate CVZY762.

# ARGUMENT

## I.    LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.    The limited role of the Court in extradition proceedings

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184.  The Secretary of State, not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Martinez v. United* States, 828 F.3d 451, 455 (6th Cir. 2016) (*en banc*); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 584 (6th Cir. 1985), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993); *In re Extradition of Bilanovic*, No. 1:08-mj-74, 2008 WL 5111846, at *4 (W.D. Mich. Dec 3, 2008) ("Extradition is an executive rather than a judicial function."). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *Charlton v. Kelly*, 229 U.S. 447, 461 (1913) (analogizing extradition hearing to a preliminary hearing in a criminal case); *see also In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) ("An extradition proceeding is not a forum in which to establish[] the guilt or innocence of the accused; rather, the sole inquiry is into probable cause."). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made").

## B.    The requirements for certification

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force

7

and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *United States v. Struga*, 231 F. Supp. 3d 244, 250 (E.D. Mich. 2017) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). The following sections briefly discuss the standards that apply to each of those requirements.

1.   Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States," but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); E.D. Mich. Crim. LR 72.1(a)(2)(A) (authorizing magistrate judges to conduct extradition proceedings om accordance with 18 U.S.C. § 3184).

2.    Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Calloo, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

3.    Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996) (noting that "the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty"). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Canada. The Court must defer to the Department of State's determination in that regard. *See, e.g., Then*, 92 F.3d 851 at 854; *Sayne v. Shipley*, 418 F.2d 679, 684 (5th Cir. 1969); *Struga*, 231 F. Supp. 3d at 250-51 (citing *Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Kastnerova v. United States*, 365 F.3d 980, 985–87 (11th Cir. 2004)).

4.    <u>Crimes covered by the treaty</u>

Extradition treaties create an obligation for the United States to surrender

fugitives under the circumstances defined in the treaty. Article 1 of the U.S.-

Canada Treaty provides for the return of fugitives who have been charged with or

convicted of an offense covered by Article 2 of the Treaty and that is committed

within the territory of the requesting country.[6] Article 2 of the Treaty defines

offenses as extraditable if the alleged conduct is punishable under the laws of both

the United States and Canada by "imprisonment or other form of detention for a

term exceeding one year or any greater punishment."

Consequently, in assessing whether the crimes for which extradition is

requested are covered by the Treaty, the Court should examine the description of

criminal conduct provided by Canada in support of its charges and decide whether

that conduct, had it been committed here, would be criminal under U.S. federal

law, the law of the state in which the hearing is held, or the law of a preponderance

of the states. *See, e.g.*, *Wright v. Henkel*, 190 U.S. 40, 61 (1903); *Zhenli Ye Gon v.*

*Holder*, 774 F.3d 207, 210 (4th Cir. 2014); *Heilbronn v. Kendall*, 775 F. Supp.

1020, 1024 (W.D. Mich. 1991). A requesting country need not establish that its

---

[6] Although not applicable here, Article 3 of the Treaty provides conditions under
which extradition may be granted for crimes committed outside the territory of the
requesting state.

crimes are identical to ours. *See Demjanjuk*, 776 F.2d at 579 ("If the acts upon which the charges of the requesting country are based are also proscribed by a law of the requested nation, the requirement of double criminality is satisfied."). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933); *see also, e.g.*, *Martinez*, 828 F.3d at 463 ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories." *Martinez*, 828 F.3d at 463 ("The point of an extradition treaty after all is to facilitate extradition . . .").

11

5. <u>Probable cause that the fugitive has committed the offenses</u>

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by Canada were committed by the person before the Court. *Demjanjuk*, 776 F.2d at 576; *see also Robinson*, 2011 WL 6072102, at *3 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings.") (citing *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006)). The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

**C.    An extradition hearing follows unique procedures**

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable

extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *see also Struga*, 231 F. Supp. 3d at 250 ("[I]t is not within the scope of the Court's inquiry to weigh the credibility of witnesses or make findings as to culpability."). Accordingly, an extradition hearing is not a criminal proceeding, and special procedures apply. *See, e.g.*, *Martinez*, 828 F.3d at 455.

The Federal Rules of Evidence do not apply to extradition proceedings. Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *see, e.g.*, *Matter of Extradition of Harusha*, 2008 WL 1701428, at *3 (E.D. Mich. Apr. 9, 2008). Hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Collins*, 259 U.S. at 317; *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977). Nothing more is required, and typically nothing more is provided. *See, e.g.*, *Demjanjuk*, 776 F.2d at 576 (finding that documentary evidence identifying the fugitive as a guard at an SS training camp is competent evidence); *Harusha*, 2008 WL 1701428, at *4 ("hearsay is permitted and admissible"). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.

*Yordi v. Nolte*, 215 U.S. 227, 231 (1909). Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); *see*, *e.g.*, *Harusha*, 2008 WL 1701428, at *3. Moreover, the fugitive has no right to discovery, s*ee Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005); *Montemayor Seguy v. United States*, 329 F. Supp. 2d 883, 889 (S.D. Tex. 2004), except in very limited circumstances, *see Demjanjuk v. Petrovsky*, 10 F.3d 338, 353-54 (6th Cir. 1993) (applying *Brady v. Maryland*, 373 U.S. 83 (1963), to the facts of that extradition case, where the United States had conducted its own investigation of the offense underlying the extradition request); *Drayer*, 190 F.3d at 413-15 (holding that the United States fulfilled its discovery obligations by turning over materials in its possession, and that any items "that may be in the possession of Canada must be sought in a Canadian forum"); *Martinez*, 828 F.3d at 470 (finding government's discovery obligations satisfied by its representation that there was no exculpatory evidence in its possession) (citing *Drayer*, 190 F.3d at 415).

14

Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *Jhirad v. Ferrandina*, 536 F.2d 478, 485 n.9 (2d Cir. 1976); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996) (citing *Collins v. Loisel*, 262 U.S. 426, 429 (1923)); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country but rather may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 461-62; *Hoxha*, 465 F.3d at 561; *In re Extradition of Hasani*, No. 2:14–mj–189, 2014 WL 4549232, *3 (S.D. Ohio Sept., 12, 2014) ("[O]nly evidence that explains the evidence submitted in support of extradition is admissible"); *In re Extradition of Basic*, No. 5:11-mj-5002, 2012 WL 3067466, at *2 (E.D. Ky. July 27, 2012). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in

order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at

316 (citation omitted). Whether to admit explanatory evidence is largely within the

court's discretion. *See In re Demjanjuk*, 603 F. Supp. 1463, 1465 (N.D. Ohio 1984)

(citing *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978) and *Collins*, 259 U.S.

at 317).

In addition, courts routinely reject technical and affirmative defenses in

extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections

to extradition that "savor of technicality"); *Harusha*, 2008 WL 1701428, at *5

("[A]ffirmative defenses, including self-defense, are not relevant in extradition

hearings and should not be considered) (citing *Charlton*, 229 U.S. at 462). These

issues, which require factual or credibility determinations, are reserved for the

courts in the requesting country to resolve after the fugitive is extradited.

## D.    Rule of non-inquiry

All matters a fugitive may raise as a defense to extradition, other than those

related to the requirements for certification, are to be considered by the Secretary

of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. The Secretary of State

takes into account humanitarian claims and applicable statutes, treaties, or policies

regarding appropriate treatment in the requesting country. *See Mironescu v.

Costner*, 480 F.3d 664, 666 (4th Cir. 2007); *see also Jhirad*, 536 F.2d at 484-85

("It is not the business of our courts to assume the responsibility for supervising

the integrity of the judicial system of another sovereign nation."). Additionally, the Secretary of State should consider a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Harusha*, 2008 WL 1701428, at *5; *Prasoprat*, 421 F.3d at 1016 (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *In re Kaine*, 55 U.S. 103, 110 (1852).

## II.   CALLOO SHOULD BE DETAINED

Just as extradition proceedings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[7] *See In re Extradition of Nagy*, No. 1:17-mj-3283, 2017 WL 6558487, at *3

---

[7] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, Calloo is

(N.D. Ohio Dec. 21, 2017); *United States v. Hills*, 765 F. Supp. 381, 385 n.5 (E.D. Mich. 1991). Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)); *see Hills*, 765 F. Supp. at 385 ("Admission to bail [in extradition matters] should be in practice an unusual and extraordinary thing, and [the] court should exercise the power very sparingly and only when the justification is pressing as well as plain.") (internal quotation marks and citation omitted).

**A.    Applicable law**

1.    <u>A Strong Presumption Against Bail Governs in an International Extradition Proceeding</u>

Unlike in domestic criminal cases, there is a "presumption against bail" in international extradition cases. *Nagy*, 2017 WL 6558487, at \*3 (citations omitted); *Hills*, 765 F. Supp. at 384-85; *see In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1578 (W.D. Mich. 1991) (noting that in extradition cases, "the presumption rests against bail"). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper

---

not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with an offense committed in violation of the law of the requesting state, Canada.

request pursuant to a valid extradition treaty, the United States is obligated to

deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and
> the law require it to do, is entitled to the delivery of the accused on the
> issue of the proper warrant, and the other government is under
> obligation to make the surrender; an obligation which it might be
> impossible to fulfill if release on bail were permitted.  The
> enforcement of the bond, if forfeited, would hardly meet the
> international demand; and the regaining of the custody of the accused
> obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The presumption exists because when, as here, a requesting country meets

the conditions of the Treaty, the United States has an "overriding foreign relations

interest in complying with treaty obligations" to deliver the fugitive. *Hills*, 765 F.

Supp. at 384-85; *see also Wright*, 190 U.S. at 62. It is important that the United

States be regarded in the international community as a country that honors its

agreements in order to be in a position to demand that other nations meet their

reciprocal obligations to the United States. Such reciprocity would be defeated if a

fugitive flees after being released on bond.

      2.    <u>Fugitives must be detained unless they establish "special</u>
               <u>circumstances" and also demonstrate that they are neither a</u>
               <u>flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*,

fugitives may not be released on bail unless they demonstrate that (1) they are

neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *In re Extradition of Martinez*, No. 13-6027, 2013 U.S. App. LEXIS 26256, at *4 (6th Cir. Oct. 8, 2013) (affirming detention order where district court found that fugitive was not a flight risk and no special circumstances justified his release). "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *Hills*, 765 F. Supp. at 384-85 ("[O]nly the existence of 'special circumstances' will warrant bail in extradition cases.").

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *Heilbronn*, 773 F. Supp. at 1581 (considering that fugitive, a multilingual medical doctor, could practice medicine in many countries and thus presented a flight risk). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See, e.g.*, *Nagy*, 2017 WL 6558487, at *3 (stating that special circumstances do not include,

standing alone, the fact that the fugitive is considered a so-called "tolerable bail risk") (citations omitted); *Hills*, 765 F. Supp. at 386 ("'[A]bsence of risk of flight' is *not* a legally cognizable 'special circumstance' to justify release on bail in extradition cases."). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *Heilbronn*, 773 F. Supp. at 1582 (denying bail where fugitive willfully had disregarded his court obligations in Israel).

"Special circumstances are limited to situations in which the justification [for release] is pressing as well as plain." *Martinez*, 2013 U.S. App. LEXIS 26256, at *4 (quoting *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *Kin-Hong*, 83 F.3d at 525; *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271–72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney or participate in pending litigation, *see, e.g.*, *Hills*, 765 F. Supp. at 387;

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Nagy*, 2017 WL 6558487, at *4; *Beresford-Redman*, 753 F. Supp. 2d at 1089; *Heilbronn*, 773 F. Supp. at 1581-82;

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Lagadec*, 386 F. Supp. 3d 629, 630 (E.D.N.C. 2019); *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 602 (W.D. Va. 2013); *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, No. CV-17-00861, 2017 WL 1197855, at *4 (C.D. Cal. Mar. 27, 2017); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *Heilbronn*, 773 F. Supp. at 1581-82 (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Nagy*, 2017 WL 6558487, at *4 (fugitive "cannot complain of the passage of time when he has been a part of the reason the time has passed"); *Antonowicz*, 2017 WL 1197855, at *3; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Antonowicz*, 2017 WL 1197855, at *3; *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 172 (S.D.N.Y. 2009); *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1386–87 (D. Nev. 1995).

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of

the strong presumption against bail and future reciprocity of other countries at stake.

### B.   Analysis

The Court should detain Calloo without bond because he is both a danger to the community and a flight risk. First, the serious nature of the offense with which Calloo is charged—first degree murder—renders him a danger to the community both here in the United States and abroad if he were released from custody. *See*, *e.g.*, *Perez-Cueva*, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail"). Indeed, Calloo is accused of shooting multiple gunshot rounds in a public place where bystanders were present. Accordingly, the Court should order Calloo detained for the duration of his extradition proceedings because he poses a danger to the community.

Second, Calloo has a strong incentive to flee given the strength of Canada's case, the government's relatively low burden of proof in extradition hearings, and the prospect of serving a lengthy prison sentence. *See*, *e.g.*, *In re Extradition of Adame*, 2013 WL 1222115, at *3  (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"); *see also*, *e.g.*, *In re Extradition of Shaw*, 14-mc-81475-WM, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is

facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."); *cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)). Indeed, Calloo has already shown incentive to flee by leaving Canada and coming to the United States. Thus, given the stakes, no amount of bail would be sufficient to guarantee Calloo's continued presence in these proceedings.

Calloo's risk of flight and danger to the community alone are enough grounds for the Court to deny any forthcoming request for bail. However, even if the Court were satisfied that Calloo is not a flight risk and poses no danger to the community, the government is unaware of any "special circumstances" that would justify bail in this case. Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to Canada, the government also requests that the Court

notify the parties within a reasonable amount of time in advance of any

contemplated release order.

## III.   CONCLUSION

For the foregoing reasons, the United States requests that Calloo be detained

pending resolution of this extradition proceeding.

Respectfully submitted,

By:   s/*Sarah Resnick Cohen*
SARAH RESNICK COHEN
Assistant U.S. Attorney
211 W. Fort St., Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9637
E-mail: sarah.cohen@usdoj.gov
Date: July 24, 2023                                Mich. Bar No.: P51968

CERTIFICATE OF SERVICE

I hereby certify that on Monday, July 24, 2023, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to the attorneys of record.

s/*Sarah Resnick Cohen*
SARAH RESNICK COHEN
Assistant U.S. Attorney
